CENTER FOR SIGHT OF CENTRAL ILLINOIS I, S.C., Plaintiff-Appellant, v. MARCUS DERANIAN, Defendant-Appellee.

Fourth District    No. 4—98—1014

Argued April 20, 1999.—Opinion filed June 17, 1999.

Albert G. Webber (argued), of Kehart, Shafter & Webber, P.C., of Decatur, for appellant.

Glen A. Featherstun (argued) and Joseph N. Van Vooren, both of Winters, Featherstun, Gaumer, Kenney, Postlewait & Stocks, of Decatur, for appellee.

JUSTICE MYERSCOUGH delivered the opinion of the court:

In April 1998 plaintiff, Center for Sight of Central Illinois I, S.C. (Center I), formerly known as Center for Sight of Central Illinois, S.C. (Center), sued to prevent defendant, Marcus Deranian, an ophthalmologist and former employee, from violating the covenant-not-to-compete clause of the parties' employment contract. In September 1998, the circuit court denied Center I's request for a preliminary injunction, finding sufficient evidence that Center had materially breached the employment contract and therefore failed to demonstrate a likelihood of success on the merits. In this interlocutory appeal, Center I claims the trial court abused its discretion because no breach sufficient to excuse Deranian's performance occurred. We affirm.

## BACKGROUND

In the early 1990s, Dr. Phillip Alward maintained a solo ophthal-

mology practice under the corporate name Phillip D. Alward, M.D., S.C. In October 1992, Deranian began working for Alward as a *locum tenens* and eventually joined the Alward Eye Clinic and Laser Surgery Center as an employee.

In July 1994, Alward sold the assets of his practice to Equivision, Inc. (Equivision). The sale was intended to free Alward of the managerial and administrative duties of running a practice so that he could focus his time and energy on patient care. The material assets and real estate necessary to the practice would henceforth be rented from Equivision and Equivision provided management services to the practice for a fee.

The transaction included the formation of Center, which was incorporated in June 1994. Alward was initially listed as the sole shareholder of Center stock, but, in August 1994, ownership of the corporation was transferred to Dr. Douglas Colkitt for $1. Colkitt, a radiation oncologist in Pennsylvania, owned Equivision stock when he became president and sole shareholder of Center. Alward testified he did not know Colkitt personally, and Colkitt played no role in the management of Center or Alward's practice. Also incident to the sale of his practice, Alward entered an employment agreement with Center and was designated "Medical Director" of Center. Alward negotiated his contract with Larry Pearson, president of Equivision.

Deranian also began negotiations with Larry Pearson in July 1994. In October 1994, they reached an agreement and Deranian signed the employment agreement at issue in this case. The contract identifies the parties to the agreement as Deranian and Center. Colkitt signed it as president. Deranian participated in the 401(k) and other employee benefit plans of Equivision. The agreement contains a restrictive covenant prohibiting Deranian from competing with Center for a period of 2 years within a 30-mile radius of Center offices in Decatur, Mattoon, Pana, Shelbyville, and Sullivan and within a 20-mile radius of the Taylorville office. Throughout negotiations, Deranian had legal counsel.

In February 1996, Equivision merged with EquiMed, and EquiMed became the management company for Center. In October or November 1996, EquiMed was purchased by Physicians Resource Group (PRG). At about the same time, Center's ownership was transferred to Bruce Goldstick, M.D. Goldstick was an ophthalmologist practicing in the greater Chicago area. When he became president of Center, Goldstick had *no knowledge of Center or Alward's practice in Decatur.* Goldstick testified, by deposition, that he assumed the position of president as a favor to agents of PRG, with whom he had a professional relationship. According to his deposition, PRG's representative told him:

" 'We're having problems now with the practice downstate. We

need your help to take over the presidency. And don't worry, you won't have any legal responsibilities and you won't have any management responsibilities. We just need a physician to be the owner.' "

Goldstick also referred to his position as that of a "figurehead" president. Goldstick paid nothing for the shares of Center stock transferred to him and received no compensation for serving as the company's president.

In February 1997, Alward filed a lawsuit against EquiMed, Center, PRG, and PRG Georgia, Inc. (Macon County case No. 97—Ch—28). In count II of his complaint, Alward alleged the defendant companies breached his employment agreement in the following ways:

"a. The medical and non-medical staff has been reduced to numbers insufficient to handle the caseload;

b. Suppliers of materials have not been paid in a timely fashion and are refusing to supply the corporation;

c. The corporation refused to buy equipment needed for the performance of the doctor's duties under this Agreement;

d. The assets of CENTER were sold without the consent of Phillip D. Alward, M.D.S.C."

The complaint alleged that such breaches hindered Alward's ability to provide patient care. Alward sought damages and to be released from the restrictive covenant of his employment agreement. Alward testified he instigated the lawsuit, on advice of counsel, to "get PRG's attention." Resolution of the lawsuit is not clear from the record, but by January 1998, Alward was negotiating with PRG to buy back his practice and terminate the management agreement.

The record indicates that Deranian's relationship with PRG was also under strain. In June 1997, Deranian wrote to Dawn Cavanaugh, regional manager at PRG, expressing dissatisfaction over working extensive hours without adequate compensation. To his letter, Deranian attached a copy of a legal opinion authored by the chief counsel to the Inspector General of the United States Department of Health and Human Services advising that the arrangement between PRG and the ophthalmology practice violated the federal anti-kickback statute, section 1320a—7b (formerly section 1128B(b)) of the Social Security Act. 42 U.S.C. § 1320a—7b (1994). In the letter to Cavanaugh, Deranian implied that per the legal opinion, his contract, assigned to PRG, has no "legitimate legal standing." He threatened to resign and continue to practice in the Decatur area.

In August 1997, the Center administrator, Donna Blackwell, issued a memorandum that limited Deranian's access to patient files. During "normal business hours," staff had to see either the manager

of the file room or Blackwell to obtain a file. After hours, the files were kept "under lock and key," and only Alward or Blackwell had access to them. In her deposition, Blackwell testified that she implemented this policy on the direction of Cavanaugh.

On January 15, 1998, Deranian did not receive his paycheck as scheduled. Neither Alward nor Donna Blackwell knew who owned Center or whom Deranian should query about his paycheck. Deranian contacted Goldstick, who told him to contact PRG. When Deranian contacted PRG, he was referred back to Alward. Deranian resigned on January 26, 1998, citing repeated material breaches of his employment agreement and nonpayment. Deranian received his paycheck on January 31, 1998.

In the effort to track down his paycheck, Deranian learned that Center had been involuntarily dissolved for nonpayment of corporate franchise taxes. In early February 1998, Deranian incorporated under that name, i.e., "Center for Sight of Central Illinois, S.C." Deranian testified that he anticipated opening a practice in the future and thought the Center name recognition would be beneficial. The original Center was reinstated in late February but was required to change its corporate name, thus Center I came into existence.

After Deranian left Center, he worked as an independent contractor for an ophthalmologist in Centralia, Illinois. His duties included practice at satellite locations in Decatur and Shelbyville. In May 1998, Deranian opened his own practice in Decatur. Although his corporate name is "Center for Sight of Central Illinois, S.C.," Deranian does business as the Central Illinois Vision Center.

In March 1998, ownership of Center I was transferred to Alward. In April 1998, Center I filed its motion for a preliminary injunction against Deranian to enforce the restrictive covenant in his employment agreement. A hearing was held, the parties submitted arguments in writing, and they stipulated to the court's consideration of discovery depositions as substantive evidence. Deranian raised several affirmative defenses, which he also argues on appeal. First, he contends Center's material breaches of the contract relieve him of the duty to honor the restrictive covenant. The alleged breaches include the following: (1) failure to pay his scheduled draw, (2) reduction of Alward's hours (which reduced Deranian's income, which was based on net income of the practice), (3) reduction in Alward's "on-call" assignments, (4) failure to provide adequate staffing and equipment such that Deranian's ability to generate fees was impaired, and (5) assignment of the contract. Deranian also contends the contract is unenforceable because (1) the compensation scheme allowed for illegal fee-splitting between physicians and nonphysicians; (2) the management

companies unlawfully engaged in the corporate practice of medicine; and (3) his employment contract was assigned in violation of public policy.

The trial court found Center I made a sufficient showing of the elements necessary for an injunction *except* a likelihood of success on the merits. Specifically, the court found:

"[T]he defendant has presented sufficient evidence indicating that the plaintiff will not prevail on the merits of the case due to substantial and material violations of the employment agreement. That the violations include but are not limited to[:] assignment of the contract, inadequate staffing[,] and reduced hours of work by Dr. Alward[,] each resulting in the diminishment of revenues beyond normal and expected fluctuations in gross revenues."

Thus, the motion for a preliminary injunction was denied. This appeal followed.

## ANALYSIS

■ Center I appeals pursuant to Supreme Court Rule 307(a)(1) (166 Ill. 2d R. 307(a)(1)). Therefore, the only question before us is whether a sufficient showing was made to the trial court to sustain the order denying the relief sought. *Postma v. Jack Brown Buick, Inc.*, 157 Ill. 2d 391, 399, 626 N.E.2d 199, 203 (1993). An appeal under this rule may not be used "as a vehicle to determine the merits of a plaintiff's case." *Postma*, 157 Ill. 2d at 399, 626 N.E.2d at 203. Trial courts have substantial discretion in deciding whether to grant a temporary injunction (*Danville Polyclinic, Ltd. v. Dethmers*, 260 Ill. App. 3d 108, 109, 631 N.E.2d 842, 843 (1994)), and the decision of the trial court will not be disturbed on appeal absent an abuse of discretion (*Weitekamp v. Lane*, 250 Ill. App. 3d 1017, 1022, 620 N.E.2d 454, 458 (1993)). The findings of the trial court will not be disturbed unless they are contrary to the manifest weight of the evidence. *Decker, Berta & Co. v. Berta*, 225 Ill. App. 3d 24, 27-28, 587 N.E.2d 72, 74 (1992).

■ As a general rule, a preliminary injunction requires a showing by a preponderance of the evidence (*Weitekamp*, 250 Ill. App. 3d at 1022, 620 N.E.2d at 458) that the plaintiff (1) has a clearly ascertainable right that needs protection, (2) will suffer irreparable harm without the protection, (3) has no adequate remedy at law, and (4) is likely to succeed on the merits (*Postma*, 157 Ill. 2d at 399, 626 N.E.2d at 204). This court has also considered whether the benefits of granting the preliminary injunction will exceed the injury to the defendant. *Danville*, 260 Ill. App. 3d at 111, 631 N.E.2d at 844; *Sarah Bush Lincoln Health Center v. Perket*, 238 Ill. App. 3d 958, 961, 605 N.E.2d 613, 616 (1992). A plaintiff need only provide *prima facie* evidence of the requisite elements to obtain injunctive relief. *Weitekamp*, 250 Ill. App. 3d at 1022, 620 N.E.2d at 458.

■ Because Illinois courts abhor restraints on trade, restrictive covenants are carefully scrutinized. *Gillespie v. Carbondale & Marion Eye Centers, Ltd.*, 251 Ill. App. 3d 625, 626, 622 N.E.2d 1267, 1269 (1993). Though generally restraints of trade are held void, where the limitation as to time and territory is not unreasonable, a restrictive covenant is valid and enforceable and relief by injunction is customary and proper. *Canfield v. Spear*, 44 Ill. 2d 49, 50-51, 254 N.E.2d 433, 434 (1969). In determining whether to grant an injunction enforcing a restrictive covenant, courts look to whether the covenant is reasonable (*Weitekamp*, 250 Ill. App. 3d at 1023, 620 N.E.2d at 459) and valid (*Retina Services, Ltd. v. Garoon*, 182 Ill. App. 3d 851, 855, 538 N.E.2d 651, 652 (1989)).

■ The trial court's conclusion that Center I failed to show a likelihood of success on the merits is not against the manifest weight of the evidence. Overturning a trial court's judgment under the manifest weight of the evidence standard requires our finding the opposite result is apparent or the findings appear to be unreasonable, arbitrary, or not based on evidence. *Bazydlo v. Volant*, 164 Ill. 2d 207, 215, 647 N.E.2d 273, 277 (1995). Given the complexity of this case, and the strength of Deranian's numerous defenses, the opposite result is not clearly evident.

Center I had the burden to show a likelihood of success on the merits by a preponderance of the evidence. *Weitekamp*, 250 Ill. App. 3d at 1022, 620 N.E.2d at 458. The trial court considered the testimony presented at the hearing, deposition testimony and exhibits. Many of the facts underlying Deranian's breach of contract defense are undisputed. Deranian's breach of contract defense is further bolstered by Alward's breach of contract action against Center, which contains some of the same factual assertions. For example, Alward's complaint asserts that staff reductions and PRG's failure to obtain equipment hindered his ability to practice. The trial court was entitled to credit the undisputed testimony indicating material breaches had occurred and was therefore entitled to find that success on the merits could not be predicted.

While analysis of Deranian's alternative defense theories is not essential to our holding, the record suggests this contract was formed in violation of section 13 of the Medical Corporation Act (Act) (805 ILCS 15/13 (West 1996)). See *People ex rel. Nelson v. Wiersema State Bank*, 361 Ill. 75, 94, 197 N.E. 537, 545 (1935). Section 13 of the Act provides:

> "All of the officers, directors[,] and shareholders of a corporation subject to this Act shall at all times be persons licensed pursuant to the Medical Practice Act of 1987. No person who is not so licensed shall have any part in the ownership, management, or control of

such corporation, nor may any proxy to vote any shares of such corporation be given to a person who is not so licensed." 805 ILCS 15/13 (West 1996).

In *Frydman v. Horn Eye Center, Ltd.*, 286 Ill. App. 3d 853, 676 N.E.2d 1355 (1997), the first district affirmed the circuit court's dismissal of the plaintiff's breach of contract claim because the contract called for conduct in violation of the Act. The plaintiff in *Frydman* was not a physician, but had entered a letter agreement with a medical corporation that provided he would become its president. The agreement also provided that plaintiff would be compensated in cash and an equity position in the company. *Frydman*, 286 Ill. App. 3d at 855, 676 N.E.2d at 1357. The reviewing court held that since the contract called for a nonphysician to be president of a medical corporation and to take part in the management and control thereof, the contract was illegal and unenforceable. *Frydman*, 286 Ill. App. 3d at 859, 676 N.E.2d at 1360.

The circumstances of this case differ from those in *Frydman*. If Deranian's contract were to be found unenforceable, it would not be because performance under the contract violated the statute but because the contract was executed in violation of the statute. Although Colkitt, president of Center, signed Deranian's contract, it appears he did so at the direction of Larry Pearson, *president of Equivision*, who drafted and negotiated the contract. Colkitt was president of Center in name only and functioned as president under the direction of Pearson and Equivision. Colkitt did not hire Deranian, manage the corporation, or manage the practice. If by negotiating Deranian's employment contract Pearson took part in the management and control of Center (a medical corporation), the contract was formed in violation of the statute. 805 ILCS 15/13 (West 1996). The record contains no evidence that Pearson is a licensed physician, or was a licensed physician when he negotiated the agreement with Deranian.

It is not unlawful for nonphysicians to negotiate employment contracts with physicians under all circumstances. Hospitals, for example, are not required to comply with the doctrine against the corporate practice of medicine because they are otherwise licensed and regulated under Illinois law. *Berlin v. Sarah Bush Lincoln Health Center*, 179 Ill. 2d 1, 15, 688 N.E.2d 106, 112 (1997). Likewise, an officer of a medical corporation is entitled to direct a nonphysician employee to enter negotiations with a physician. Under the circumstances of this case, however, the medical corporation was a "dummy" corporation whose president was controlled by nonphysicians. We question whether the signature of a "figurehead president" satisfies the requirements of the Act since to do so seems to elevate a legal technicality over the substance of the law.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

KNECHT, P.J., and COOK, J., concur.